May it please the Court, I'm Bruce Gerstein and I'm here on behalf of the Direct Purchase of Class. I'd like to reserve three minutes for rebuttal that will be granted. Mr. Gerstein, as always, the members of the panel have read the briefs and prepared for the arguments, plural, we're going to hear this morning. Could you begin, though, with a brief description of the agreement that is at the center of this litigation, and then go on to discuss it in the wake of Actavis and Kingdra, and why, in your view, this is not, in the view of the appellants, this is not a customary sort of settlement agreement. Mr. Rafferty. The agreement that was entered into between Pfizer and Rambaxi, settling the Lipitor litigation, had a number of different components. One, obviously, was an agreement to settle the patents, the U.S. patents that were being asserted against Rambaxi. Some of them were being asserted, some of them just existed. As well as, specifically, the settlement of the ACIPRA litigation, which is parallel litigation that had been ongoing between the same parties at that time, as well as there were issues regarding foreign sales of Lipitor. Some of them were in litigation, some of them weren't. And they were wrapped up in this agreement. I think there was another Dutch cataway that also was part of this. It's important to look at this from our perspective. We allege, principally, that the ACIPRA agreement, if that settlement was a sweetheart deal, that it had a long litigation history, and that, specifically, on the basis of that history, you could clearly establish or create a prima facie showing that it was a sweetheart deal. Well, a sweetheart deal is a term I'm sure we can all connect, in a pejorative sense, to a particular type of arrangement. But I think the case law that we're working with here really speaks in terms of whether something is a traditional agreement or whether we have something else, right? Well, we're not attacking, from the antitrust point of view, the ACIPRA agreement. The issue about ACIPRA is whether or not it's currency for the reverse payment. And the question is whether or not it shows that it's both large and unexplained. Yes, I think you could, based on the facts that we specifically pledge. So what would you suggest makes it large and unexplained? Well, if you look at the history of the case, specifically, there were two parallel cases. One was there was a sister case, which was defined as ACIPRA 1 in the complaint, which was against Tevar, involving the same patent litigation. It had gone, basically, through the district court and up through the federal circuit and basically was held in FISA's favor. That and many of the issues overlapped into ACIPRA 2. ACIPRA 2 specifically went through a preliminary injunction and, specifically, virtually all discovery. What's important about the preliminary injunction is that the court had to make a finding of likelihood of success at that point. It was initially the same judge, Judge Debovois, for both ACIPRA 1 and ACIPRA 2. The principal issue there is on claim construction, because there was a slight difference between what the parties had. Judge Debovois had to resolve that, and he resolved it on FISA's favor, is to claim construction in connection with the preliminary injunction. That went to the federal circuit and was affirmed, saying there was a substantial likelihood of success. So those are facts as to the litigation. Although, and I'll get to this in a second, defendants have raised, well, the ACIPRA case was still an issue. They can't point to a single ruling by the court that put any of the prior rulings in either ACIPRA 1 or ACIPRA 2 at risk of being reversed. So clearly you had that. You had other facts that were clearly alleged, specifically as to the market effect of ACIPRA 1. You're taking us on a long journey through the procedural background in these cases, which, frankly, in my view, is the most complex thing about the case, given the several layers of it. But I'm not sure you've been entirely responsive to Judge Ambrose's question, which centered on the two aspects that are part of our inquiry, and that is, was the payment large and was it unexplained? Well, if you go to the question of large, your Honor, the question of large is, and this was actually one of the issues that came out in the Lamicto case in dealing with it, is the Supreme Court, an activist, and that's what Lamicto was following, was the first court that interpreted it, was specifically, it's not a quantitative test. It's a qualitative test. Specifically, what would be large enough or significant enough to induce the generic, to either quit the fight or to delay market action? What do we have to look to? We're in a relatively new and developing area of the law, and the term large, at least, has not been fleshed out to any great extent, even in this circuit. I agree with that, but starting with one thing we all do know is the Supreme Court never put a monetary number on that. It was contextual. So if you go back specifically to the complaint and the active, and specifically the ACIPRO litigation, the question is, was enough facts pled to show that this was a substantial case worth hundreds of millions of dollars? Pfizer had a claim where market went from $525 million to $71 million as a result of Rambaxy and Tevers' market entry. Specifically, they had a claim as to that monetary value. The reason I went through all the detail as to when the complaint goes through the detail of the procedural history is it shows the likelihood that Pfizer had a very, very substantial claim that it was going to win, and it sacrificed that for a million dollars. Mr. Gersten, when you're talking about the agreement, the one fault, the principal fault, that it seems that the district court found with your amended complaint was that you didn't plead a value, that you didn't plead enough that the payment could be valued in a way that it was large and it was unexplained, and it could constitute the reverse payment. What's your answer to that? My answer to that is, at the complaint stage, that that would be a heightened pleading. What they're asking for specifically is to quantify. So you're saying it's a heightened pleading, but the court said that under Actavis, there needed to be a valuation specific enough in the complaint to find plausibility. I agree that that's what the court said, but the reality is that plausibility could be established by thresholds that are not examined. Do you believe the need to resort to the characterization of heightened pleading? First of all, we have nothing in the case law that suggests the degree of specificity in terms of valuation that the district court seemed to require here, do we? That's correct, Your Honor. Your time is up, Mr. Gersten. If I could just mention one other point that's related to that. Very quickly, since you have reserved time. We did, and it's unique in this case, because of the injunction, and because the judicial establishment of likelihood of success that it's more than 50 percent, after the court made its ruling, we did seek to amend under Rule 59E specifically, and the court rejected that, even if you used his standard on the basis of, if this was emerging law, as the court recognized, we feel that either way, we've met that. On rebuttal, I never got to the damage issue, which I'm supposed to cover. If I'd like to recover that on rebuttal. All right. Thank you, Mr. Gersten. Mr. Sobel. Good morning, and may it please the court, and good morning, Judge Fischer. I'm Tom Sobel, with Huggins, Berman, Sobel, Shapiro, for the proposed direct purchasing class. I'm here to address the Walker process fraud matter. I'm quite candidly more interested in your questions than I am in my little speech, so if there are any questions, please fire away. Let me just start out with something basic that is to establish probably agreement here. I don't believe our court has ever really addressed requirements or elements of the Walker process claim, but rather we have cited to and relied upon federal circuit authority. Is that a correct characterization, you think, Judge Gersten? I think that's fair to say, and I also don't think there's much of a mystery, really, about the elements of a Walker process fraud. It's basically a common fraud type of standard, and so I don't think there's any mystery there. So in this case, the operative complaint painstakingly laid out in 87 paragraphs in detail how it was that Pfizer misrepresented the relative ability of the enantiomer as compared to its race mate molecule in terms of its ability to inhibit cholesterol production. That misrepresentation was critical and fundamental to getting this enantiomer patent. We went into detail. We defined who it was, the names of the inventors, the names of the lawyers, when it occurred, how it occurred. That was material, the intent. The complaint really just goes on in detail. So the district court here applied collateral estoppel, did it not? It functionally did. Not explicitly, but it effectively applied that. It effectively did that, and it did so by citing two cases that were about law at the case. Of course, we went parties to the underlying litigation between Pfizer and Rambaxi, so it really just didn't apply there. And what would be your argument that the effective application of collateral estoppel should not have occurred here? Well, it just fundamentally is different parties, and therefore that's the case. So it begins and ends right there. What bearing should that Canadian and Australian litigation have? None. It should have none to this case. We put it into our complaint because we didn't want jurists to think that this was just some allegations that were being made out of, you know, whole cloth. But, in fact, what happened here was that the same similar claim of fraud regarding the relative ability was tried in Australia. So you included it in a complaint really just to allege the fact of those litigations? The fact of, yes. But also, frankly, a complaint sometimes does something more than simply set forth facts, right? Sometimes you're also trying to persuade and show that you've actually got some legs to your case, and that's the purpose of throwing that in there, too. You know, the district court really, when it made the following observation, it said that its ruling did not, quote, did not rest on any failure of the plaintiff's part to satisfy Rule 8 and 9b. And so that's really where the court should have ended its inquiry, and it went much further than it needed to in this case. I'll also indicate that regarding the reissue, the court observed that the patent had been reissued through the patent office and that during the course of that reissuance, Pfizer had put into the record of the PTO some of the materials that had occurred from Australia and Canada. But we, again, declared quite clearly, though that proceeding should be irrelevant to this inquiry regarding 1286, we also pled and made clear that the patent office was told explicitly by Pfizer, please do not rely upon the data that we gave you earlier in order to get this patent. And so when it did that, and then in fact, what was relied on or what Pfizer wanted them to rely on was commercial success. It was commercial success, and that itself was also sort of an illogical thing, but it was able to persuade the patent office nevertheless to issue the patent. And why do I say it was illogical? It's because of this. There were two patents. It is legally permissible, however. It's not unheard of. Commercial success is. The question is what are you comparing your commercial success to? Usually you have two products in the marketplace that you can make a comparison. Here, both patents covered Lipitor. And so Pfizer's argument de facto was Lipitor is better than Lipitor, which made no absolute sense in terms of commercial success. And that's a point we try to make out of my time. We did reserve some time for both. Thank you. I'm sorry, you didn't reserve? I did, for two minutes. Thank you. Mr. Perling. May it please the Court, Scott Perling for the Walgreen Plaintiffs. I want to make three brief points, Your Honors. First, I want to reiterate what Mr. Sobel said, which is that Judge Sheridan's reliance on the outcome of cases that our clients were not parties to is a denial-of-due process. It's practically legally equivalent to unconstitutionally imposing collateral estoppel against a non-party. If we can't make a plausible allegation because it contradicts something that some other judge found in a different case, then we're out of court and we're stuck with the outcome of that case. That's a denial-of-due process. Second, our sham citizen's petition allegations should not have been dismissed. We alleged at great length and in great detail in our complaints that Pfizer had no scientific basis for the citizen's petition. So what should a court reviewing the complaint here take the allegations, and the fact of, apparently, the FDA's lengthy delay in reviewing the petition? Judge, certainly it's something that the court can consider. But it seems to me there's competing inferences here that are being argued with respect to that delay. Am I correct? There are. One of the things that we've alleged, which we believe the court had to take as true, is that there was no reason to act on the citizen's petition until the date arrived for getting Baxter to enter under the settlement agreement, and that's why it took so long. Certainly there's no logic to the proposition that because an agency takes a long time to decide something, that it has to have merit. That's certainly not the case. In this case, we explained why Pfizer's petition contradicted a longstanding policy of the FDA. It had no scientific basis. And basically the rule that Judge Sheridan applied was that if it takes a long time to resolve it and the decision itself doesn't criticize or sanction the petitioner, then it can't be issued. And that proposition is inconsistent with the court's case, this court's case, and the Hanover Realty case. And the language from that, which appears on page 182, is the fact that the Department of Transportation was required to consider defendant's challenge does not mean that their arguments had any merit. And finally, the district court should not have limited our damage period. At the time of the reverse payment settlement agreement, the 995 patent had been declared invalid, and Pfizer was attempting to get the patent reissued. Rambaxi was opposing that attempt. By paying Rambaxi to stay off the market and drop its opposition, Pfizer greatly reduced the likelihood that the patent would not be reissued. An activist makes it clear that the validity and infringement of the patent that is at issue in the dispute that's being settled by the settlement parties should not be presumed. That if there's a dispute going on between the parties about whether that patent is valid or not, there is no presumption that it is valid. And therefore, the court erred in saying we could not possibly recover damages prior to the expiration date of the 995 patent. And that's even assuming that the Walker process ruling stands up. Thank you very much, Mr. Carver. Thank you. Mr. Lefty. Oh, I'm sorry. Mr. Woodward. Good morning, yes. If you'll please report. I'm David Woodward. It's a privilege and an honor to appear before this panel on behalf of the NPR plaintiffs and the proposed NPR class. I'd like, if I could, to make two points in less than two minutes. My first point is this. We would respectfully ask that the district court be reversed because it failed to apply established pleading standards. It required plaintiffs to plead evidence, and it represented an imposition. Requiring the plaintiffs to plead evidence. I haven't heard anybody say this so far in the arguments, though one could certainly infer that it is the bottom line. I assume it is the position universally of the appellants and their counsel that this is a matter much more susceptible and indeed most appropriately to be addressed on some judgment motion rather than motions. That's correct, Your Honor. And I think that that fundamental error is a common thread running through the arguments of all of my co-counsel. The allegations in these, in the various iterations ultimately that point upon which the court ruled for purposes of our arguments today included allegations of some of the science that would be applicable here. Incredible, right? It did, Your Honor. And if I could give four very quick examples of what I'm talking about here. Mr. Sobel touched upon this in his remarks. The district court found that the allegations on the Walker process fraud claim, for example, were sufficiently detailed under Rules 8a and 9b, and yet it found them implausible because it reasoned that plaintiffs had only a glimmer of hope that a jury would credit those allegations. We recognize that this court recognized in Fowler case that their standards of pleading are not the same as standards of proof, as you're pointing out, Your Honor. Also, the Supreme Court has cautioned that a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts alleged in the complaint may be improbable. Another example, Mr. Kirwan was mentioning the alleged sham FDA citizen petition issue. The district court ignored the plaintiffs' allegations in that case. It resolved the factual dispute in the motion to dismiss stage. It credited the defendant's position and ignored the plaintiffs' allegations in their complaint on that issue. It's not up to the district court in the motion to dismiss to ignore plaintiffs' allegations or credit the contrary position of the defendant. Mr. Woodward, let me ask you one question, if I could. If the size of the payment and the justifications for it play a role in the plausibly alleging a reverse payment, why shouldn't Under Act K that she be required to plead facts sufficient to show the size of the payment and the justification? I think, Your Honor, it's a great question. And I think that the answer to it is that we more than satisfied our obligation under our very detailed complaint with respect to the size of the reverse payment. And to give you examples, on the issue of the forgiveness of millions of dollars worth of liability in the Acupril 2 litigation, that is repeated in our complaint at several points. We also allege that there was a posting by Pfizer of a $200 million bond, which is suggestive of the stakes involved and recognized by both parties. We allege that the payment far exceeded the cost of any actual or potential litigation costs. And also, in this case, there's the element of Pfizer granting to Rambach the right to market generic Lipitor in 11 foreign countries. The CEO, we allege in the complaint, of Rambach, at the time this agreement was entered into, said that it provided Rambach with huge revenue upside. It described the settlement as the largest in the pharmaceutical industry, and it provided Rambach with revenue of over $13 billion. We think these allegations, coupled with an industry estimate that the value of the agreement was, on the revenue side, of up to $1.5 billion over a four-year period from 2008 to 2012, those are more than sufficient allegations to meet a large payment requirement under Act 8, Mr. Honors. Very quick additional examples would be, on ignoring existing pleading standards, would be the court's insistence that plaintiffs must show a reliable foundation for estimating the value of the reverse payment. In fact, the district court said that one must demonstrate the evidence upon which Pfizer would have likely relied upon at that time, the act of litigation. There's no requirement that an antitrust plaintiff plead evidence. The fourth example, Your Honor, I'll summarize them. I won't go into the details on each one. But it is the discounting by the district court of the statements made by senior management of Pfizer as to the millions of dollars of damages that were at stake and intended to recover from Rambach. My final point, Your Honor, is why does this matter? Forty-five years ago, the Supreme Court of the United States v. Popco answered the question as to why antitrust law mattered. And the words it used are very familiar to this court. It said that antitrust laws in general and the Sherman Act in particular are the magna carta of free enterprise. They are as important to the preservation of economic freedom and our free enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. Two years ago, in the King Drug case, this court put it very succinctly and said that antitrust law is designed to protect consumers from arrangements that prevent competition in the marketplace. That is exactly this case. Unless the district court is reversed, Your Honors, we submit that the development in this still-evolving area of the law, which is in its infancy, is going to be undermined and the purposes of antitrust law are going to be undercut as well. Thank you very much. Thank you very much. And now Mr. Lefkowitz. Good morning. Thank you, Your Honors. Jay Lefkowitz for the affiliates. I'll focus on the reverse payment side of the question, and Mr. Nome will address the Walker process issue. Very good. It would be helpful if we began with inquiry and discussion. That big picture issue that I asked about a few minutes ago, and that is to put it succinctly, why isn't this a case that would be more appropriately addressed? It's just, in fact, only appropriately addressed on summary judgment. Where in the jurisprudence is there any suggestion that appellants have to value their claim beyond more general allegations? Well, Your Honor, I will stop there. That's exactly the same question I have. I don't understand what's going on here. I'll answer that question through the prism of the very first thing Your Honor said when you asked isn't this a commonplace or customary settlement. What they are alleging here in their complaint is that the settlement in one case, Acupril, was itself a reverse payment to buy off a delay in the entry in another case. And, of course, as the Supreme Court said in Activist 2233, the kind of case that Acupril settled where you had two companies with hundreds of millions of dollars of competing damages claims. They want to pretend that it was only a one-way case, but they acknowledged that Pfizer had posted a $200 million bond, and then after the PI had been granted, they moved for summary judgment, and they lost. So this was a fair fight, and, of course, the party settled. Now, they're suggesting, nevertheless, Pfizer couldn't have lost. And so the question that you're asking is why shouldn't this go over for summary judgment? Before you get into the specifics, and we'll get there, let's just step back for a second. 12B6 doesn't permit dismissals because the judge doesn't believe actual proof of the facts is probable. But isn't that what the judge did here? Actually, no. The judge followed this Court and the Supreme Court's guidance. This Court said in Southern Cross Overseas Agency... What did the judge do here? He said they didn't plead sufficient facts to allege a reverse payment. He said that there wasn't enough pledge stated to give a reliable foundation to estimate what the damages or the cost would be. That sounds like Rule 56. Well, actually, Your Honor, and this is obviously a de novo review of the legal standard, I think the judge is correct that they didn't plead anything to explain why the settlement in Acuprol was not explainable, because it was customary, or that it constituted a large payment. But this Court has made clear, and the Supreme Court in Tel Aviv has made clear, that to resolve the 12B6 motion, and I'm quoting this Court's opinion in Southern Cross, a court may properly look at public records, including judicial proceedings, in addition to allegations in the complaint, to see if they contradict the complaint's legal conclusions or factual claims. That's on a 12B6. And what their allegations here, if I just may, Your Honor... That merely tells us what a court, what a district court, can do, may do. I don't see how that helps you here. Actually, the Supreme Court in Tel Aviv says the court must consider the complaint in its entirety, including documents that the court can take judicial notice of. And here, their allegations are not allegations that say Pfizer and Rambaxi exchanged e-mails or had conversations that said, we want to give you a later entry in one case, we can't pay you in that case, so instead let's settle a different case at a different price. Why should we be concerned about a judge's reference in his opinion, bearing the motion to dismiss, where he, as one of your adversaries pointed out just a few moments ago, referred to evidence. We don't talk about evidence when we're talking about motions to dismiss. Absolutely. We talk about... Shouldn't that be a red flag to this panel? And again, Your Honor, I think it's incumbent upon this court to look and to do a de novo review of what is alleged in this complaint. And there is nothing alleged in this complaint in a Trombley-Iqbal world. We're not in a Conley versus Gibson world. They have to allege something, as the court said in Trombley, only by taking care to require allegations that reach levels suggesting conspiracy. No, Trombley and Iqbal require plausibility. Correct. How in the world is what they allege not plausible? Because it is an absolutely customary settlement. And in fact, companies all over the country settle multiple disputes at the same time. But it's a customary settlement with a tail. And the tail involves the delay with regard to the generic. So you said, you know, Tellez talks about looking at the composite big picture. That's true. I thought your argument in your briefing was that just resettle Acupril. And that's one thing. And don't mix and match it with the other thing that occurred here. That is correct, Your Honor. There is no credible allegation to conflate the two. Acupril was a settlement of a case where two companies that had hundreds of millions of dollars of claims against each other at a point where the court had denied Pfizer's motion for summary judgment said, we're going to go to trial on all of these invalidity and infringement enforceability issues. And then the parties said, you know what? We both have a lot of risk. We'll settle. Now, they are saying that settlement in that traditional commonplace case was actually a payment. It was a sinister conspiracy to pay for delay in a case where the only settlement in that other case was purely. Back to the beginning, the Chief Judge's questions. It sounds like that's a Rule 56 issue. Your Honor, I think if you look at the jurisprudence under Iqbal and Trombley, the question is, have they pledged facts sufficient to suggest that discovery would lead to evidence here? The evidence obviously would have to come later. But the question is, have they pledged anything? And when all they have done is cherry-pick a few events from the docket in Acapulco, and this court's opinion and the in the Southern Cross and the Supreme Court in Tel Aviv said, it's incumbent upon the court to take judicial notice of the rest of the docket. And the rest of the docket. Mr. Lester, let me be talking about the various cases. How can this reliable foundation language, which the district court used in this case, all be consistent with what our court said in King Brook? It seems to me to be inconsistent with reading or articulating any such requirement. Just look at page 403. Page what, Your Honor? 403, large unexplained. What has this got to do with that? They have not alleged anything large, anything unexplained in their claim. The large is pretty simple. That among many other things, the executives and attorneys represented on behalf of FISA represented that the claims in Acapulco were worth hundreds of millions of dollars in damages. If I may, Your Honor, what they were talking about is their side of the case. They had claims worth hundreds of millions of dollars for infringement, and Rambacci had claims worth hundreds of millions of dollars for which FISA had already posted a $200 million bond. And the Acapulco case was settled for how much, a million dollars? It settled for a million dollars. So from hundreds of millions to a million, but the tail was also something dealing with the liberatory. But there were hundreds of millions of dollars of exposure that FISA also had. In other words, they were each suing each other for hundreds of millions of dollars. Yeah, but why isn't that enough at the pleading stage? At the 12B6 stage, the allegations that they made seemed to be enough to get them past 12B6. That's the bottom line. As Judge Fischer suggests, that's the bottom line. There are two parts to that answer, Your Honor. One is that the Supreme Court makes clear that the kind of settlement that took place in Acapulco, and the Supreme Court says it at 2233 of the opinion in Acapulco, where it specifically identifies a case where an alleged infringer actually pays money, receives money from the patentee because there are counterclaims, and says that's a traditional settlement. So if they're going to go and say that in a world where companies regularly settle multiple disputes at the same time, and they're going to say that in a case where it is a commonplace traditional settlement, that that settlement is actually sinister, that that's payment for a delay in a separate lawsuit which settled completely with just a plain vanilla early entry, they have to make allegations to demonstrate that it's somehow sinister. Let me ask. Yes. While there may be reasons that Acapulco's will be worth a lot less than what FISA had represented, how can the plaintiffs actually value the Acapulco settlement without the benefit of discovery? Well, they actually had quite a bit of discovery. In fact, the judge in the case, before going into the summary judgment, Was that jurisdictional discovery? He required the parties, he required the grand baptist to provide discovery about the Acapulco litigation. The question, though, Your Honor, is they have to do, they have to allege that there is a large and unexplained payment. They don't even have any allegation that there's any payment at all. Because if, in fact, both parties settled competing claims in a case that was hotly contested, that was heading towards trial, where each party could potentially lose hundreds of millions of dollars, then they actually haven't alleged that there was any inappropriate value. And certainly whatever was transferred was completely explainable by the exchange of releases. Mr. Lefkowitz, Judge Fischer quite appropriately asked about our jurisprudence, about King Drug. Let me follow up on that and ask you about the First Circuit's decision just last year, in my listening tour, I believe is how it's pronounced. There, the First Circuit said, consistent with the quantity, which declines to require heightened fact pleading specifics, we do not require that the plaintiffs provide precise figures and calculations at the pleading stage. Isn't that what you're asking? If I may give you an example. Let's say that in addition to the Lipitor settlement, the second transaction that existed, for which they were suggesting was a reverse payment, was just a supply agreement. Pfizer will provide supply of a different product to Rambatsy. And let's say they allege that the market value for that product should be $100, and the supply agreement was $80. There would be, in that case, a pleading that even if it wasn't specific, given the volumes involved, you would know on the face of the pleading that they had alleged that there was a payment being made, because they would say it's undervalued. But in this case, there is no way, based on their pleadings, of suggesting that what was done in the Acuprope case had any additional value outside of a fair, arm's-length settlement of that Acuprope case. They don't have any pleadings in the case other than cherry-picking a few of the docket entries in Acuprope and saying, therefore, Pfizer was going to win, therefore, when they took a million dollars, it was really a giveaway. But, in fact, both companies had a lot to lose, and so they did what they normally do in that type of situation, and they both compromised their expected damage claim. In that respect, you argue that since both sides had a lot to lose, this is in the nature of a traditional settlement agreement. That is correct. Obviously, we've gone a little beyond your time, Mr. Rothkowitz. Thank you very much. Thank you. Mr. Milne. If it pleases the Court, Robert Milne on behalf of Pfizer. If I could, Your Honors, I'd like to begin with some comments on the patent settlement issues and to pick up on some of the discussion that has occurred. One point I'd like to make at the outset, in response to Judge Ambrose's comment about the size and the pleading requirements, Judge Ambrose, you focused on the claim of the damages that Pfizer had with respect to the Acupro patent case. I would respectfully submit that that is not really the thing we should be focusing on when we're talking about the adequacy of the pleadings of an alleged reverse payment here, because what the plaintiffs are saying is not that it's a $200 million reverse payment because Pfizer had a damage claim of that amount. What they're saying is that the $1 million settlement was somehow unreasonably low and that the real settlement should have been a higher amount. So that the delta that we're talking about here, the alleged giveaway, is the difference between the actual settlement amount and what they would suggest is the quote-unquote appropriate settlement amount with respect to the American Acupro patent case. At the 26th stage, I mean, one can make an argument in the last decade that maybe two of the most important civil procedure decisions that have come out of the Supreme Court are $1.2 million. And so you don't have to have something that, you know, with conjecture could possibly be a good cause of action. It has to be plausible. It has to be plausible on its face. And you may win at summary judgment, you may win at trial, whatever it may be, but how is this not plausible on its face? And what I would say, Your Honor, is why this is not plausible on its face is because the plaintiffs have not addressed that key issue with facts to make plausible their theory here. What they are doing is alleging all kinds of purported, and as Mr. Lefkoe has said, we believe cherry-picked facts out of the full. You asked the question about what kind of discovery occurred. It was complete discovery. Millions of pages of documents on the whole history of the Acupril litigation. So they had everything. And what they did was cherry-pick. Wait a minute. Time out for a second. We use cherry-pick always pejoratively. They picked out facts that support what they believe is a plausible claim that the Acupril was tied in with what happened with regards to Lipitor. And here's my point, Your Honor, is that their focus is on the likelihood in the litigation of Pfizer recovering the full amount of its lost profit damage claim. And in doing so, they're basically ignoring the fact of what would a reasonable settlement have been. And they're implausible in their pleadings in multiple dimensions with respect to what they are focusing on. But the thing that they're not focusing on is what is that delta between the settlement that occurred and the settlement that they say would have occurred. That's the reverse payment. And they're silent on that. And I think that is a clear pleading failure. Your Honor mentioned the First Circuit's decision in Lowestern. The First Circuit in Lowestern at, I have a Lexus site here, Star 32 and 33 at the Lexus site, went on and said that it is appropriate at the pleading stage for the plaintiffs to come forward with some facts to allow at least some form of facts sufficient to estimate the value of the claim payment at least to the extent of determining whether it's large and unjustified. I don't see how that helps you. Facts, not figures. Right, right. Facts, not figures. Understood. And so what the plaintiffs have done here is they're silent. The only alleged reverse payment that they're really making here with respect to this settlement is they're saying that the Acupril settlement was an underpayment. But they never tell us what that underpayment was. Even by estimate. At 46, do they have to? Well, I think they have to provide us the First Circuit. Where does it say in King Drug that they have to tell you where there's a reasonable estimate of what that actual payment should be? King Drug does not directly address that issue, Your Honor. And is King Drug the precedent here? It is the precedent here, but I don't believe that King Drug was squarely addressing the issue of pleadings required for making plausible the idea of largeness. And obviously what was at issue in King Drug is very different than here. What we have here, just to step back for a second, is the settlement. What was happening here was these companies were engaged in litigation around the world. Patent litigation, much of it relating to Lipitor, some of it relating to other products. They wanted to achieve global peace. And they entered into 16 settlement agreements. They documented it in one document, to be sure. Each settlement expressly lawful under activists. Even the Acapryl settlement. Because in activists at 2233, the Supreme Court specifically identifies the compromise of damage claims as a traditional settlement that does not require additional antitrust scrutiny. Even though the court in activists said that where you have a $40 million, they used this example citing a law review article, where you have a $40 million compromise of a $100 million damage claim, that can be regarded as an implicit net payment. But the Supreme Court did not say, pointedly did not say, that's traditional only if we go in and we evaluate the merits of the underlying patent case and figure out whether that was enough and whether that had any role and any impact on the entry date that was agreed to between the two companies. The court didn't say that. And now what the plaintiffs are saying, they're not really disputing that, but they're saying, well, because we're not focused on the Acapryl case itself, or that hypothetical case that the court was talking about in activists, we're saying, let's compare the Acapryl settlement to the Lipitor settlement. Suddenly we get to do that kind of inquiry. That's not, there's no basis in logic or jurisprudence for that to be the case. Because Mr. Miller, Mr. Milne, let's go back to these payments. You're saying that the allegations were insufficient to show plausibility, but one of the things that clearly was part of this settlement was the delay of the generic from entering into the Lipitor market until November of 2011. That was part of the settlement. Well, that was worth, I mean, the pleadings allege that that was worth hundreds of millions of dollars. It was certainly a valuable settlement, and that entry date, which was a future entry date, happened to be six years before the expiration of the relevant patents. So it was, in that sense, an early entry date that was agreed upon. But the Supreme Court in activists, just to be very clear here, where the court identified at least two forms. It was trying to draw lines. Of course the court was trying to do that. It was trying to draw lines between the kinds of traditional settlements that it did not want to be dragged through massive antitrust litigation and the unusual kind. And two of the traditional categories that the court identified were entry date settlements, where, as Your Honor indicates, there would be an entry date in the future, quote-unquote delay, but still entry before the patent expires. The court said that's lawful. We're not going to second-guess those. In fact, that's even pro-competitive. And then the second one was the settlement of the compromise of damage claims, where there may be an entry date involved as well. And when you look at the law review article that the court cited on that compromise of damage claims, the example that is being discussed in the law review article involves a license where the generic stays off the market until the patent expires. And yet the court is saying we're not going to invite going back in there. Now, I'm not saying you can never have a situation where a settlement is so one-sided and the plaintiffs can plead it with plausibility, but I would submit that what they have done here makes it very difficult. If this case goes forward, how do companies settle? When I'm counseling, and I do a lot of counseling, when I'm counseling companies and they're settling litigations, you have the whole issue, well, what am I allowed to do? Well, I look at activists and I see these safe harbors, if you will. You can flip around what you just said. The consequences are, if we rule in your favor, that you can do pretty much anything and it will be deemed to be implausible, not a summary judgment, but Act 12b-6. Your Honor, I would respectfully disagree with that, Your Honor, because what I would say is, and as I just said, we are not saying that you could never come forward with something like a pleading of some settlement was a total sham. Of course you can. But I think we have to consider the context of what the Supreme Court was doing in activist as we consider those pleadings. But even that was brought into play, the sham element with regard to the 995 patent. Well, I would like to address the... In terms of pleading. Pardon me? In terms of pleading, that was brought into play. Right, but there's no claim that the underlying dispute here, the alleged payment, the Acapril settlement was somehow a sham settlement or the like. What the plaintiffs have done is that I would submit they have an utter failure of pleading as to what it is, at least in broad terms, what it is that they're saying... Let's go back to Judge Fischer's question. Yes. The 893 patent expired, what, in March of 2010, and the 995 patent expired in June of 2011. So you've bought 20 months and 6 months delay. And as part of that, you settled what was worth hundreds of millions of dollars for a million dollars in Acapril. You put those together. That's what Telex tells us. Look at the composite. The pages from our court tells us that. How is that not a pleading that survives? Well, Your Honor, what I would say is, first of all, what you're ignoring is the other patents. So there were at least two other patents that were at issue in the settled litigation, the 740 patent and the 511 patent that were processed patents and didn't expire until 2017. And so the entry date here was actually an early entry date settlement falling squarely within the traditional category of activists. But not as to these two patents, correct? Right. But the patents in litigation included the processed patents. And so when we look at the settlements here, and again, this is not a per se rule of legality. What it's saying is that if you hew to the safe harbors, you shouldn't expect to be brought into court because I settled a case. I'm trying to achieve global peace. So I settle case A. Is my settlement of case A going to somehow be turned around on me and used as evidence somehow of reverse payment in case B? Or I settle a case in January. Is somebody going to turn around and say a case I settled against that same company? Before you sit down, let's go back to the very first question asked at the outset of this argument by the Chief Judge here. When we talk about 436, it talks about plausibility. What does plausible mean to you? Plausible means that you can nudge something over the line of being, you know, plausible suggests that there is a decent basis to believe that a claim could be successful if you accept as true the facts alleged in the complaint. And the if you accept necessarily suggests that what we're talking about is on its face, right? On its face, assuming that there is no obligation to accept as true facts masquerading as conclusion or conclusions masquerading as facts and assertions of fact that are contradicted by either the law or by public record materials that the court could take judicial notice of. That's right out of Wright and Miller. So there's no obligation to do that. And I think just to give one example, Your Honor, the plaintiffs come in and they say the upper bound here on the Acupril settlement is $250 or so million, $225 or so million in terms of realistic recovery that Pfizer could have expected. That is, nobody denies here that that's predicated on a lost profits measure of damages. Nobody denies that. And nobody denies also that the standard, in fact, the expert that the plaintiffs put in in their proposed amended complaint, supporting their amended complaint, lays out the standard that lost profits depend on there not being a non-infringing product in the marketplace at the same time that the defendant is in the market. So there can't be non-infringing product alternatives in the market at the time. There is no dispute here. The plaintiffs have admitted it, and I can give you the record site where they admitted that, at 3888 of the joint appendix, admitted that during Rambaxi's alleged period of infringement with Acupril, there was a licensed generic in the marketplace, a non-infringing alternative. And so this upper bound of damages is refuted by the law. And so it's implausible. And when you have non-infringing competition in the marketplace, then you're talking about a reasonable royalty measure of damages, which is much lower. So again, failures of pleading. The key issue, again, being this difference between what the plaintiffs are saying is the proper settlement amount and the actual settlement amount, and there's zero pleading on that. And, Your Honors, I did not get time to address the Walker process issues. I don't have any questions. The one point, if I could make, is that we vehemently disagree that Judge Sheridan imposed collateral estoppel. What he did was he honored. And I think we've already established with our questions to your colleagues on the other side that he at no point explicitly called it collateral estoppel. He didn't call it collateral estoppel. I'm not sure, frankly, having read the opinion, just what he was doing with it. Well, I think what he was doing, Your Honor, was honoring Iqbal. And this Court's decision in the In Re Shearing case, it says you have to consider content. And what he did was there were these prior proceedings that had occurred. And courts do it all the time, where there has been a prior proceeding, a prior judicial proceeding or regulatory proceeding, coming out a certain way on a particular set of facts. And now you come in, and it's not collateral estoppel, to be sure. You come in as a plaintiff, and now you have those same sets of facts, and you say, I want a different outcome. As a pure matter of Twombly pleading to make something plausible, it is incumbent on you to say, well, why should there be a different result? Why shouldn't of all that, what happened in the other cases, regardless of what you call it and regardless of what Judge Sheridan called it, why shouldn't that have been considered at the summary judgment stage, not the motion to dismiss? Well, if we get to summary judgment, most certainly it should be. But if that's more appropriate, it could have been looked at there, not here. Well, Your Honors, we cite cases in our papers, including the Orion Power case, the 7 West 57th case, the Premier Electric case, the Judge Easterbrook opinion, where the courts at a motion to dismiss stage are considering the results of prior decisions. And here you had the very party that was allegedly defrauded, the PTO, who nobody is denying all of the foreign regulatory rulings, the alleged admissions after the Delaware trial, all of that was affirmatively disclosed to the PTO in the reissue proceeding, and yet the patent reissued. And I think that just all goes to show that the plaintiffs never came forward with any facts that would say, hey, there's some piece of prior art or something like that that actually wasn't before the PTO and wasn't considered in the Delaware trial. All right. Thank you very much, Mr. Milne. We've, of course, gone beyond the time that that's the tradition, if you will, in this court. Thank you very much. I appreciate your indulgence. We'll turn to rebuttal and Mr. Gerstein. Very quick, Your Honor. I just wanted to make a comment about what Mr. Milne just said regarding he was talking about in Acquitrell, specifically in the allegations, when Rambaxi slash Tether came to market and that there was a license generic and that would be taken into consideration with its value. The license generic was FISAs, which would not have been triggered. But that just highlights exactly the issue here, summary judgment. You'd actually have to establish those various elements if you're making a precise valuation of what the damages would be. The only other point I keep on making is that they keep on saying that the Acquitrell was a traditional settlement where the evidence that we allege, our allegations, our factual allegations, was specifically a case worth hundreds of millions of dollars, similar to what was alleged in Lamictal, and they just deny it. They ignore our allegations in the complaint and they come in there and say, well, since we settled, we just basically deny that it wasn't a one-way settlement. But that's what summary judgment is about. What they're actually asking this Court is that if, in fact, the currency for the reverse payment is the settlement of another action, no matter how extreme, it should be effectively per se legal. And that goes exactly against what activist courts were saying and what this Court was saying in Lamictal. With that, I won't waive any other rebuttal that I have, unless the Court has questions for me. Thank you. Yes, sir. Thank you very much, Mr. Christian. Mr. Sobel. Briefly, Your Honor. Two points. First, you asked Mr. Perwin a question about the citizen petition and whether there's any inference to be drawn by the amount of time that it ostensibly takes the FDA to make such a ruling. I would suggest that there's no inference to be made at all. There's a tradition in the FDA not to issue decisions until such time as it really needs to do so. And in particular, with respect to issues regarding bioequivalence, it often waits until it issues final approval for an abbreviated new drug application because it doesn't want to set itself up, if you will, months or years beforehand. So I would suggest there's no reason to do that. There's been some questions about summary judgment and the various standards. I'd like to make this point. We know what the standard is at a 12 to 6 stage. At summary judgment, of course, the issue is whether the evidence is sufficient to warrant a reasonable jury to find a particular fact. Even at summary judgment, the question is not how likely or not the plaintiff is going to win. I'm not talking about burden of proof. Now, that said, in summary judgment, a burden of proof may be a backdrop to how we discuss the evidence. For example, in a fraud case, the fact that you may be looking at a heightened burden of proof and you're not convincing evidence may enter into discussions of the evidence. But aside from that, there is not an evidentiary hurdle to be met. Which is my point. And I'm just simply trying to contrast even the summary judgment standard to what the court did here, which was the court here was really trying to give its own opinion of handicapping what it is the likelihood of the plaintiff winning either of these two issues. And that's getting into burden of proof. That is in fact what happens. In closing, I would just say that this is an important case. This involved the largest selling drug in the history of the United States pharmaceutical industry. We're six years into this case. We need to go back before the district court to be shepherded through to the trial soon. Thank you. Thank you very much. Thank you to all of counsel. We're going to take a brief five-minute recess, just five minutes to allow people to change seats.